UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**Mohamed Hisam Najib**,

        Plaintiff,                       Case No. C2: 03-CV-1269

v.                                       JUDGE GREGORY L. FROST
                                            Magistrate Judge Abel

**Meridian Medical Technologies, Inc. et al.**,

        Defendants.

## OPINION & ORDER

This products liability action is before the Court for consideration of a motion for summary judgment filed by Defendants Meridian Medical Technologies and King Pharmaceuticals, Inc. ("Defendants") (Doc. # 27). Plaintiff Mohamed Hisam Najib ("Plaintiff") filed a memorandum in opposition. (Doc. # 29). After reviewing the pleadings and filings, the Court finds the motion well-taken and therefore **GRANTS** the same. (Doc. # 27).

## BACKGROUND

Plaintiff is an Ohio resident. (Doc. # 1 at ¶ 1). He has asthma and his doctor prescribed epinephrine for Plaintiff to use when he suffered asthma attacks. (Doc. # 1 at ¶ 7). Specifically, Plaintiff's doctor prescribed the EpiPen, which is a self-contained auto-injectable unit containing one dose of epinephrine. *Id.*

Defendant Meridian's principle place of business is in Maryland. *Id.* at ¶ 2. Meridian manufactures the EpiPen. Defendant King purchased Meridian in 2003. *Id.* at ¶ 3. As such, Meridian is a wholly owned subsidiary of Defendant King, and King is Meridian's successor in interest. *Id.* King's principle place of business is in Tennessee. *Id.* at ¶ 4. Additionally,

1

Plaintiff's complaint lists John Does # 1 - 10 as Defendants and describes them as "entities and/or businesses including predecessors-in-interest to and successors-in-interest of Meridian, . . . and/or persons whose names and addresses could not be discovered by Plaintiff as of the filing of this Complaint and who are liable to Plaintiff for injuries as alleged herein." *Id.* at ¶ 5. As of the date of this Order, Plaintiff has failed to serve the John Doe Defendants.

On April 26, 1997, Plaintiff suffered an asthma attack.[1] *Id.* at ¶ 16. He removed the EpiPen from its packaging and both he and his fiance, Julie Campbell, unsuccessfully attempted to remove the gray cap. *Id.* at ¶ 17. Because the cap was unable to be removed, Plaintiff could not administer the epinephrine and his attack worsened to the point that he stopped breathing. *Id.* at ¶ 18. Campbell called 911 and began administering CPR. *Id.* Plaintiff was without oxygen for approximately seven (7) minutes before Campbell was able to resuscitate him. *Id.* The fire department arrived and transported Plaintiff to a local hospital by ambulance. *Id.* at ¶ 19. When Campbell returned home after the incident, she was unable to find all of the EpiPen's components and she assumed that the fire department had disposed of them. (Campbell Dep. 55).

Plaintiff filed suit in state court in 1999, alleging that as a direct and proximate result of the EpiPen's failure, he suffered debilitating injuries as well as emotional distress and incurred

---

[1] Plaintiff's complaint also states that he suffered an asthma attack on April 19, 1997. (Doc. # 1 ¶ 11). During that attack, Plaintiff alleges that the EpiPen failed to discharge the epinephrine. *Id.* at ¶¶ 12-14. Plaintiff's fiancé, Julie Campbell, quickly injected Plaintiff with the drug by using a standard syringe and needle. *Id.* at ¶¶ 14-15. Accordingly, Plaintiff does not claim that he was injured or suffered damages as a result of this incident. Moreover, the report of Plaintiff's medical device expert, Edward Reese, focuses on the April 26, 2004 incident. (Reese Dep. 40-41, 49). Thus, the Court will exclusively address the second incident. (Doc. # 29 at 2).

substantial medical bills. (Doc. # 1; Doc. # 29 at 1). Plaintiff dismissed that case and subsequently re-filed his action in state court within the one-year filing deadline. (Doc. # 29 at 1). Defendants then removed the action to this Court. (Doc. # 1).

Plaintiff's current complaint is essentially the same as his first, and he asserts the following common law or state law claims: (1) negligent design, manufacture, failure to warn, failure to provide clear instructions; (2) defect in manufacture or construction under Ohio Revised Code § 2307.74; (3) conformance to representation under Ohio Revised Code § 2307.77; (4) supplier liability under O.R.C. § 2307.78; and (5) breach of the implied warranty of merchantability. *Id.* Defendants have moved for summary judgment, and it is to an examination of that motion that this Court now turns.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52). However, in ruling on a motion for summary judgment, "a district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

## DISCUSSION

Defendants removed the instant action to this Court pursuant to 28 U.S.C. § 1441 based upon the diversity statute, 28 U.S.C. § 1332. (Doc. # 1). Consequently, the Court will apply Ohio's state substantive law but will utilize federal procedural law. *Belcher v. Great Lakes Steel Corp.*, 843 F.2d 1390 (6th Cir. 1988) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)); *see also Hanna v. Plumer*, 380 U.S. 460 (1965).

Defendants assert two arguments in support of their motion. First, Defendants argue that summary judgment is proper because Plaintiff's experts fail to satisfy the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) standards and also fail to raise genuine issues of material fact. (Doc. # 27 at 5). Second, Defendants maintain that the Court should sanction Plaintiff for failing to preserve evidence - specifically, the missing parts of the EpiPen - by granting their motion for summary judgment. *Id.* at 13. In response, Plaintiff first argues that

4

the opinions of his experts meet *Daubert's* requirements and are relevant. (Doc. # 29 at 4, 14). Next, Plaintiff posits that because he did not intentionally or negligently destroy the missing parts, and because Defendants are not prejudiced by the missing parts, summary judgment is improper. *Id.* at 16. The Court finds Defendants' arguments more persuasive.

A. **ADMISSIBILITY OF PLAINTIFF'S EXPERT TESTIMONY**

To begin, Defendants argue that the opinions of Plaintiff's experts are inadmissible because they do not comport with Ohio R. Evid. 702 and they do not satisfy *Daubert's* threshold inquiries. (Doc. # 27 at 5). At the outset, the Court notes that the Defendants are confused about which Court they are in; this Court, as noted above, applies the federal, not state, Rules of Evidence. Consequently, the Court will examine the admissibility of Plaintiff's experts pursuant to the Federal Rules of Evidence and controlling case authority.

The United States Supreme Court held that Fed. Rs. Evid. 104(a) and 702 govern the admissibility of expert witness testimony and require that the trial judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[2] *Daubert,* 509 U.S.

---

[2] Rule 104(a) provides:

Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of

at 589.  In *Kumho Tire v. Carmichael,* 526 U.S. 137, 141 (1997), the Supreme Court clarified that this gatekeeping obligation applies to all expert testimony.  In discussing scientific knowledge, the *Daubert* Court explained:

> The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation. . . . Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science. . . . But, in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation--i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability.

*Daubert*, 509 U.S. at 590.  In addition, Rule 702 requires that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue."  This question of relevance, described as "fit," "is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.* at 591. Thus, the Court, faced with Plaintiff's offer of expert testimony, must determine whether the expert

> is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

---

> an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

6

*Id.* at 592-93 (footnote omitted). "It is the proponent of the testimony that must establish its admissibility by a preponderance of proof." *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 250-251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

The inquiry's "overarching subject is the scientific validity - and thus the evidentiary relevance and reliability - of the principles that underlie a proposed submission." *Daubert*, 509 U.S. at 594-95. Several factors may bear on the reliability inquiry, but the *Daubert* Court emphasized that the inquiry is "a flexible one." *Id.* at 594. Those factors include whether: (1) a theory or technique can be or has been tested; (2) it has been subjected to peer review and publication; (3) a technique has a known or potential rate of error and the existence of standards controlling its operation; and (4) the theory or technique enjoys general acceptance in a relevant scientific community. *Id.* at 591. In keeping with its description of the inquiry as "flexible," the Court reiterated in *Kumho* that the *Daubert* factors were neither definitive, nor exhaustive, and may or may not be pertinent to the assessment in any particular case. *Kumho*, 526 U.S. at 141. To that end, noting that the *Daubert* factors will often be appropriate in determining reliability, the *Kumho* Court found that the trial court must consider whether the factors are reasonable measures of reliability in a given case. *Id.* at 152.

Having set forth the appropriate standard for reviewing the admissibility of expert testimony, the Court will now determine whether Plaintiff's proffered experts Edward Reese ("Reese") and Jack Raber ("Raber") satisfy Fed. R. Evid. Rules 104(a) and 702 as well as *Daubert*.

    **1.**     **Edward Reese**

Plaintiff offers Reese as a medical device expert. (Doc. # 29 at 4). Defendants assert that because Reese's report fails to identify the specific aspect of the EpiPen that failed, the Court should grant their motion for summary judgment on all of Plaintiff's claims. (Doc. # 27 at 11-12). In contrast, Plaintiff posits that summary judgment would be improper because Reece's report indicates that, in his opinion, "something departed from the specifications, whether in the design or manufacturing process, to cause the EpiPen to fail." (Doc. # 29 at 6).

Preliminarily, the Court notes that Reese is qualified to receive an expert designation. Although he is not an engineer, his curriculum vitae establishes that he earned his undergraduate degree from Metropolitan State University; his Master of Science Degree from Cardinal Stritch University; and his Ph.D. in medical technology studies from Union Graduate School. (Doc. # 27 Ex. C; Reese Dep. 9). Moreover, Reese spent a year at the Food and Drug Administration ("FDA") for his doctoral internship. *Id.* Accordingly, his primary focus is FDA rules and regulations. (Reese Dep. 9). Since 1971, Reese has worked in the private sector in various jobs dealing with medical devices, and he is currently Co-Founder and Vic-President of Genesis Medical, Inc. (Doc. # 27 Ex. C). Genesis Medical, Inc. provides consulting services to the medical device manufacturing industry. (Reese Dep. 8). Additionally, he is a Board Certified Forensic Examiner, a Level Five Certified Medical Examiner, and is Board Certified in Forensic Medicine. (Doc. # 27 Ex. C). His background has enabled him to testify as a medical device expert in twenty (20) trials. *Id.* Given these facts, and because Defendants do not object to the Plaintiff's labeling Reese as an expert, the Court holds that Reese's knowledge, skill, experience, training, and education qualify him as an expert. *See* Doc. # 27.

Next, the Court must determine whether Reece's testimony is relevant to the situation at

hand.  (Fed. R. Evid. 702; *see also Daubert*, *supra*).  In order to accomplish this, the Court will examine Reese's report and deposition testimony in light of each of Plaintiff's claims.

### a. Negligent design, manufacture, failure to warn, and failure to provide usable instructions.

Surprisingly, neither party addressed the elements of Plaintiff's negligence claims in their briefs. In order to maintain a negligence action, the plaintiff must show the existence of a duty, a breach of that duty, and that the breach of that duty proximately caused the plaintiff's injury. *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1144 (Ohio 2002).  Whether Defendants owe Plaintiff a duty is a question of law for the Court to determine.  *Wallace v. Ohio DOC*, 773 N.E.2d 1018, 1026 (Ohio 2002).  The Court will assume for purposes of deciding the current motion that Defendants did owe Plaintiff a duty.  Accordingly, the issue thus becomes whether Reece's testimony would help the jury determine whether and how the EpiPens were defective.

### i. Negligent design & manufacture

Under the common law action for negligent design, a product's design is defective "if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risk inherent in such design."[3] *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1146

---

[3] Plaintiff asserts both common law and statutory product liability claims.  The Ohio Supreme Court held that "The common-law action of negligent design survives the enactment of the Ohio Products Liability Act, R.C. 2307.71 et seq." *Carrel v. Allied Prods. Corp.*, 677 N.E.2d 795, paragraph one of the syllabus (Ohio 1997).  Likewise, Plaintiff may assert both a common law and a statutory claim for failure to warn.  *City of Cincinnati,* 768 N.E.2d at 1147.

(2002) (citing *Knitz v. Minster Machine Co.,* 432 N.E.2d 814, at syllabus (Ohio 1982)).

Moreover, a product may be defective in design if the manufacturer fails to incorporate feasible safety features to prevent foreseeable injuries. *Perkins v. Wilkinson Sword, Inc.*, 700 N.E.2d 1247 (Ohio 1998). Next, a product is negligently manufactured under Ohio law if it differs in a material way from its design specifications or from otherwise identical units. *Kemp v. Medtronic, Inc.*, 1999 U.S. Dist. LEXIS 22470, at * 24 (S.D. OH 1999).

Reece's testimony and report on negligent design and manufacture is far from enlightening. Specifically, Reese testified:

> I don't believe that I have found anything that indicates that there's a departure from design specification. You know, first of all, I don't have the physical parts to physically measure that. I haven't seen any information that has indicated that there's been a specific design departure. What I'm saying is that something departed, either in the manufacturing procedures and/or in - - we have a cause here, and the cause can only come, in my opinion, from one of two areas: from the design and/or the manufacturing process. And the manufacturing process involves everything from the time you're [sic] handling the raw components of material and all the subsequent steps its supposed to go through to assure its compliance to specifications. But something failed in the process, whether it was the methodology of the way these receptor pins are inserted, you know, but something failed that did not permit this gray cap to be removed.
>
> I cannot tell you that I have seen anything that I can specifically say, here's a departure from design. I took physical measurements of an exemplar, but, of course, that does not represent the device. And, of course, I'd love to have the [EpiPen that Plaintiff used] but I don't have [that].

Reese Dep. 77-78. Essentially, Reese's expert opinion is that something malfunctioned, but he

does not know what.[4]  In fact, Reese did not even review the EpiPen's design specifications or manufacturing procedures.  (Reese Dep. 13-15, 31, 41).  This prevented him from addressing whether and how the EpiPen differed in a material way from its design specifications or from otherwise identical units.   Further, Reese's testimony does not address if the EpiPen is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risk inherent in such design.  Finally, because Reese was unable to identify the alleged defect at issue, he could not comment on alternative safety design measures.  As such, the Court holds that his testimony and report will not help the trier of fact determine whether the EpiPen was negligently designed or manufactured.  Accordingly, the Court **GRANTS** the Defendants' motion for summary judgment on these claims.[5]

     **ii.**  **Failure to warn**

To recover under a failure-to-warn theory at common law, the plaintiff must prove that

---

[4] The Court observes that Reese may have been hampered in rendering a more detailed opinion by Plaintiff's failure to provide him with adequate information, including the manufacturing procedures, the EpiPen at issue, and enough time to examine the materials he did have.  (Reese Dep. 13-15).  Plaintiff retained Reese on July 5, 2004; Reese completed his report on July 14, 2004.  (Reese Dep. 31; Doc. # 27 Ex. C).

[5] Plaintiff's theory seems to be *res ispa loquitor*.  However, the Ohio Supreme Court rejects applying that doctrine in products liability cases.  *Gast v. Sears Roebuck & Co.*, 313 N.E.2d 831, 834 (Ohio 1974).

the manufacturer knew or should have known, in the exercise of reasonable care, of the risk or hazard about which it failed to warn and that the manufacturer failed to take precautions that a reasonable person would take in presenting the product to the public. *Crislip v. TCH Liquidating Co.,* 556 N.E.2d 1177, 1182-1183 (Ohio 1990).

As stated above, Reese was unable to identify the alleged defect. Accordingly, Plaintiff has failed to prove that Defendants knew or should have known about a defect that Reese cannot even identify. Accordingly, Defendants are entitled to summary judgment on this claim as well.

### iii. Failure to provide usable instructions

Plaintiff also asserts that Defendants negligently failed to provide him with "clear and usable instructions" for the proper use of the EpiPen that allegedly malfunctioned on April 26, 1997. (Doc. # 1 ¶ 39). On this claim, Reece's report conclusory states that Defendants "failed to provide adequate direction for use." (Doc. # 27 Ex. C at 9). Because Reece's report fails to detail how the instructions were unclear, his conclusion is irrelevant. Additionally, Julie Campbell testified in her deposition that she had read and understood the directions that were enclosed with the EpiPen. (Campbell Dep. 21-22). Defendants are therefore entitled to summary judgment on Plaintiff's negligent failure to give usable instructions claim.

### b. Defect in manufacture or construction

In order for Plaintiff to recover on a products liability claim under Ohio Revised Code § 2307.74, he must establish by a preponderance of the evidence that: "(1) [t]here was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendant; and (3) the defect was the direct and proximate cause

of the plaintiff's injuries or loss." *State Auto. Mut. Ins. Co. v. Chrysler Corp.*, 304 N.E.2d 891, paragraph two of the syllabus (1973); *see also State Farm Fire & Cas. Co. v. Chrysler Corp*, 523 N.E.2d 489 (1988).

Plaintiff is unable to satisfy the first requirement. Namely, Reese cannot state what the alleged defect was. As such, because Plaintiff has failed to offer sufficient expert testimony, the Court **GRANTS** Defendants' motion for summary judgment on this claim.

### c. Conformance to representation

Plaintiff argues that when it left Defendants' control, the EpiPen he used on April 26, 1997 failed to conform to Defendants' representations in violation of O.R.C. § 2307.77. (Doc. # 1 ¶ 34). Because Plaintiff failed to produce any evidence that the EpiPen in question was defective, Defendants' motion for summary judgment on this claim is granted.

### d. Liability of supplier

Next, Plaintiff maintains a claim under O.R.C. § 2307.78 against the Defendants. That section allows suppliers to be found liable in certain situations for compensatory damages in products liability actions. Specifically, the statute provides:

> (A) . . . [A] supplier is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes, by a preponderance of the evidence, that either of the following applies:
>
> (1) The supplier in question was negligent and that, negligence was a proximate cause of harm for which the claimant seeks to recover compensatory damages; [OR]
>
> (2) The product in question did not conform, when it left the control of the supplier in question, to a representation made by that supplier, and that representation and the failure to conform to it were a proximate cause of harm for which the claimant seeks to recover compensatory damages. A supplier is subject to liability for such a representation and the failure to conform to it even though the supplier did not act fraudulently, recklessly, or negligently in making the representation.

O.R.C. § 2307.78. "Supplier" as used in Ohio's products liability statute is defined as "[a] person that, in the course of a business conducted for the purpose, sells, *distributes*, . . . a product in the stream of commerce." O.R.C. § 2307.71(O). However, the statute specifically states that "supplier" does not include "manufacturer." O.R.C. § 2307.71(O)(2)(a).

Plaintiff's complaint alleges that the Defendants "are in the business of manufacturing, distributing, and/or selling . . . EpiPens." (Doc. # 1 at ¶ 2). To the extent that Defendants either distributed or sold the EpiPen, their motion for summary judgment on this claim is **GRANTED** because Plaintiff failed to produce any evidence that the Defendants were negligent and, in the alternative, also failed to produce any evidence that the EpiPen failed to conform to Defendants' representations.

Moreover, assuming that Defendants are manufacturers of the EpiPen, R.C. § 2307.71(O)(2)(a) prohibits them from being classified as suppliers under R.C. § 2307.71(O). Accordingly, Defendants are not suppliers and could not be found liable under R.C. § 2307.71(O). Defendants' motion for summary judgment on this claim, to the extent it is asserted against them, is **GRANTED**.[6]

### e. Breach of implied warranty of merchantability

Finally, Plaintiff asserts that Defendants breached the implied warranty of merchantability. (Doc. # 1 at ¶ ¶ 39-42). Essentially, this is a tort claim based upon

---

[6] Perhaps Plaintiff intended to name one of the John Doe Defendants as the alleged supplier. To that end, Plaintiff failed to effect service on them.

> the breach of a duty assumed by the manufacturer-seller of a product. This duty is assumed by the manufacturer by reason of his implicit representation of good and merchantable quality and fitness for intended use when he sells the product. This duty is breached when a defect in the product causes the collapse of the product and is the direct and proximate cause of injury to a person whose presence the defendant could reasonably anticipate.

*Lonzrick v. Republic Steel Corp.*, 218 N.E.2d 185, 188 (Ohio 1966). Thus, Plaintiff is required to allege and prove that there was a defect in the EpiPen manufactured and sold by the Defendants, that such defect existed at the time the EpiPen was sold by the Defendants, that the defect was the direct and proximate cause of Plaintiff's injuries, and that the Plaintiff, was a foreseeable user of the product. *See id.*

Again, Plaintiff's expert failed to: (1) establish how the EpiPen in question was defective; and (2) prove that the alleged defect existed at the time it left Defendants' control. Accordingly, Defendants are entitled to summary judgment on Plaintiff's breach of the implied warranty of merchantability claim.

In brief, the Court concludes that Reese's testimony is irrelevant because it would not help a jury determine whether and how the EpiPen was defective. Moreover, the Court concludes that his testimony is not based on sufficient facts or data as Rule 702 requires. Reese testified that he did not examine the EpiPen at issue and that he did not have all of the information he would have liked to complete his report. (Reese Dep. 13-15). Accordingly, the Court **GRANTS** the Defendants' motion for summary judgment. (Doc. # 27).

    2.    **Jack Raber**

Plaintiff offers the deposition testimony of Raber, a pharmacist, to establish that the EpiPen could be used to treat asthma attacks. (Doc. # 29 at 14-16). Thus, Raber did not testify

15

to Plaintiff's manufacturing or design defect claims, nor did his testimony address Plaintiff's inadequate warning and instruction claims. (Raber Dep. 34, 40-44). Because the Court excluded Reece's report and testimony above, Plaintiff is unable to establish that the EpiPen malfunctioned. Consequently, Reece's testimony becomes irrelevant and the Court **GRANTS** the Defendants' motion for summary judgment for lack of evidence.

## CONCLUSION

Defendants' motion for summary judgment is **GRANTED**. (Doc. # 27).

Plaintiff is **ORDERED** to show cause within 5 (five) business days of this Order why the Court should not dismiss his claims, to the extent that any remain, against the John Doe Defendants for failure to effect service on them in accordance with Federal Rule of Civil Procedure 4(m). Failure to do so will result in dismissal of those claims without prejudice.

**IT IS SO ORDERED.**


   /s/   Gregory L. Frost

**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**